IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

ELTON B. SIDERS,         )
         )
         Plaintiff,      )
         )
vs.         )      Case No. 11-1033-CV-W-ODS
         )
MICHAEL J. ASTRUE,         )
Commissioner of Social Security,         )
         )
         Defendant.      )


## ORDER AND OPINION AFFIRMING FINAL DECISION

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying his disability application. The Commissioner's decision is affirmed.


### I.  BACKGROUND

Plaintiff Elton B. Siders is a 51-year-old male with past relevant work as a heavy exertion semiskilled construction worker. He alleges he became disabled on May 5, 2009.

The ALJ determined Siders suffered from the severe impairments of bipolar disorder and myopic degeneration.[1] The ALJ concluded Siders was not disabled after finding he retained the residual functional capacity (RFC) to perform other work found to exist in significant numbers in the national economy.

---

[1] Degenerative myopia is "[a] high degree of myopia [nearsightedness] associated with degenerative changes in the posterior segment of the eye . . . .  The degenerative changes can result in abnormal visual function, such as a decrease in best corrected visual acuity or changes in visual fields." American Optometric Association, Care of the Patient with Myopia 7 (1997), *available at* http://www.aoa.org/documents/CPG-15.pdf.

## II. DISCUSSION

The Court must affirm the ALJ's decision if it is supported by substantial evidence on the record as a whole. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). Substantial evidence is relevant evidence a reasonable mind would accept as adequate to support a conclusion. *Id.* Evidence that both supports and detracts from the ALJ's decision must be considered. *Id.* If two inconsistent positions can be drawn from the evidence, and one of those positions represents the ALJ's decision, it will be affirmed. *Id.*

### *(a) Opinion Evidence*

Siders first argues the ALJ should have given controlling weight to the opinion of his psychiatrist, David L. Vlach, MD. Dr. Vlach opined Siders suffered from marked difficulties in maintaining social functioning; marked deficiencies of concentration, persistence, or pace resulting in a failure to complete tasks in a timely manner; and repeated episodes of decompensation.

One of the requirements for controlling weight to be given to a treating source's opinion is that the opinion be "well-supported by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Siders makes no effort to show Dr. Vlach's opinion met this requirement, so Siders has failed to establish Dr. Vlach's opinion was entitled to controlling weight.

Siders next argues the ALJ failed to properly weigh Dr. Vlach's opinion. When a treating source's opinion is not given controlling weight the ALJ is supposed to apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of § 404.1527 and § 416.927, as well as the factors in paragraphs (c)(3) through (c)(6), in determining what weight should be given. These factors generally include the examining and treatment relationship, supportability and consistency of the opinion, specialization of the medical source, and any other relevant factors.

Siders maintains that, "aside from detailing several visits Mr. Siders had with Dr.

2

Vlach, the ALJ did not weigh the opinion using any of these factors." Siders fails to acknowledge the "several visits [he] had with Dr. Vlach"—particularly the later ones—are inconsistent with Dr. Vlach's opinion.

Siders began seeing Dr. Vlach in July 2009. Siders' main problem was his longstanding preoccupation with what he perceived to be unfair treatment at a job two and one-half years earlier. Siders fantasized about revenge against those responsible. He also complained of being unable to calm down. His speech was rapid and loud, and his eye contact and overall affect were "intense." Dr. Vlach also noted "[t]hought processes [were] tangential and notable for flight of ideas." Siders was diagnosed with (among other things) bipolar I disorder, and he was assigned a Global Assessment of Function (GAF) rating of 40.[2] He was prescribed Risperdal (an atypical antipsychotic).

The ALJ found "the claimant's bipolar disorder was stabilized with medications in less than 12 months from the alleged onset date." This finding is supported by substantial competent evidence in the record as a whole. Siders gradually improved. By October 2009 he reported that his preoccupation about his former job was "significantly less." He also reported an overall decrease in agitation, sleeping a solid eight hours at night, and that he had a girlfriend. His mother additionally reported he was doing well.

In December 2009 he reported he was doing "'really good.'" Siders highlights that despite this report Dr. Vlach still assigned him a GAF rating of 50.[3] Siders also asserts he had been assigned a rating of 50 or lower for the previous 17 months. But for only 5 of those 17 months (July through December 2009) had Siders complied with

_____

[2] A GAF rating indicates a clinician's judgment of an individual's overall level of functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. text rev. 2000). The 31–40 range reflects "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ." *Id.* at 34.

[3] A rating in the 41–50 range reflects "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* at 34.

treatment recommendations. And notwithstanding Dr. Vlach's GAF rating of 50 Siders began working at a job the next month (January 2010) that lasted about two months and provided him with $6,523.00 in earnings. By March 2010 Dr. Vlach noted Siders was continuing to improve and assigned him a GAF rating of 65.[4]

Siders argues the March 2010 note—which is the last mental health treatment note—"cannot be descriptive of [his] mental functioning for the entire period at question." The ALJ did not find that it was. The ALJ found that it evidenced stabilization of Siders' mood. Since Siders' impairment needed to last or be expected to last at least 12 months for him to be found disabled, *see* §§ 404.1509, 416.909, his stabilization 10 months after his alleged onset date was significant.

Siders also asserts "it is unknown whether [he] was able to remain stable." But Siders' mental health had been gradually improving—not fluctuating—since prescription treatment began in July 2009. And the ALJ's opinion denying benefits was not issued until January 2011, so if Siders' mental health deteriorated after March 2010 one would reasonably expect to find some evidence of it in the record. The fact there is none implies Siders remained stable.[5]

Siders lastly contends with respect to Dr. Vlach "the ALJ failed to address the consistency between Dr. Vlach's opinion and the numerous mental-health encounters Mr. Siders has had since the age of 14." According to Dr. Vlach Siders last received mental health treatment in 2004 before starting treatment in 2009. The Court holds that evidence occurring after Siders' alleged onset date (May 5, 2009), when he was seeing Dr. Vlach, is more probative of Siders' relevant condition than evidence from six years

---

[4] A rating in the 61–70 range reflects "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Diagnostic and Statistical Manual of Mental Disorders 34.

[5] There is no suggestion Siders did not seek treatment because of financial constraints. *See Clark v. Shalala*, 28 F.3d 828, 831 n.4 (8th Cir.1994) ("Economic justifications for the lack of treatment can be relevant to a disability determination. However, the claimant offered no testimony or other evidence that she had been denied further treatment or access to prescription pain medicine on account of financial constraints" (citation omitted).).

4

and even decades ago. Siders has failed to establish the ALJ improperly weighed Dr. Vlach's opinion.

Siders next argues the ALJ should not have assigned significant weight to the opinion of a state agency psychologist. The psychologist opined Siders was mildly restricted in activities of daily living; experienced moderate difficulties in maintaining social functioning; and experienced moderate difficulties in maintaining concentration, persistence, or pace.

Siders maintains the ALJ should have given less weight to the psychologist's opinion because the psychologist did not examine Siders and did not have the benefit of reviewing Dr. Vlach's opinion (rendered several months later) or listening to Siders' testimony. But state agency examiners conduct their review at an earlier stage in the process. What Siders complains of is true of every examiner's opinion (except those who examine the claimants).

Siders also maintains less weight should have been given because the psychologist did not review the records documenting his history of mental health treatment. As already indicated Siders has not persuaded the Court that the records from his past are probative of his condition during the relevant period.

And even if the ALJ had discounted the psychologist's opinion for the reasons advanced by Siders, that would not mean Dr. Vlach's opinion would be entitled to more weight (which is what Siders seems to imply). The key evidence against Siders' claim is his gradual mental health improvement and mood stabilization, and his performance of work for about two months beginning in January 2010. This provides substantial evidence supporting the ALJ's decision notwithstanding the psychologist's opinion.

*(b) RFC Assessment*

Siders contends the ALJ should have included limitations with respect to concentration, persistence, or pace in the RFC assessment. The ALJ found Siders was only mildly limited in these areas; the only mental limitations in the RFC assessment refer to social interaction: "Mentally, the claimant cannot work around the public and can

5

tolerate only occasional interaction with coworkers."

Siders' primary rationale for why limitations with respect to concentration, persistence, or pace should have been included in the RFC assessment is that each of the only medical opinions in the record (from Dr. Vlach and the state agency psychologist) included at least moderate limitations in these areas. Siders emphasizes that the ALJ gave the state agency psychologist's opinion significant weight but failed to give any reason for disagreeing with the psychologist on Siders' ability to maintain concentration, persistence, or pace.

Just because the ALJ gave significant weight to the state agency psychologist's opinion does not mean the ALJ adopted it in its entirety. The ALJ could draw inferences regarding Siders' mental limitations from other parts of the record as well. Particularly Siders' two-month employment in January 2010 and stabilization in mood by March 2010 constitute substantial evidence of only mild limitations in concentration, persistence, or pace.

Further support for this conclusion comes from the fact—cited by the Commissioner—that Siders never "testif[ied] that issues with concentration, persistence, or pace impeded his ability to work." When asked by the ALJ why he could not work, Siders responded, "It's my trouble getting along. The problem I had at [the job where he was terminated], I haven't been able to let it go. I've had nightmares about it that's kept me up at night." The ALJ followed up by questioning how the nightmares affected Siders' ability to work, and Siders testified, "I wake up in the middle of the night and I shake a lot from it. I mean I shake all the time." And when Siders was asked by his attorney at the hearing whether he thought he had "some problems in [his] thinking," Siders responded "[d]efinitely," but when asked to describe the problem he said, "[M]y main problem is I want to work, but I know that I can't because when I lost my ability to obtain the DOT physical [because of vision problems] and things just got so out of hand at [the job where he was terminated], I don't know where to go from here."

Siders also contends the RFC assessment was deficient because it failed to include limitations for his myopic degeneration beyond a restriction on work requiring fine visual acuity. The Court rejects this argument. Siders testified he had this problem

for seven years yet he never suggested it prevented him from working. (Siders' earning record shows he worked from 2003 to 2009, and he worked for the two months in January 2010.) Siders moreover has not attempted to show that the restrictions he says should have been included (inability to read without bringing items close to his eyes, inability to drive at night) would have changed the VE's testimony that he could perform the representative jobs. Without this showing the Court cannot say the ALJ's RFC assessment lacked substantial evidence in the record as a whole.

*(c) 2010 Employment*

Siders lastly contends the ALJ should have considered his 2010 employment to be an unsuccessful work attempt or part of a trial work period, rather than evidence inconsistent with his claim of disability. The Court disagrees.

In his brief Siders asserts he "was eventually terminated for unsatisfactory performance." But there is no evidence that supports this assertion. Two weeks after he was laid off he had an appointment with Dr. Vlach. According to Dr. Vlach's note, Siders said "that this construction work was very good for him. He lost about 14 pounds largely due to his increased physical activity." Nothing else was noted about the job, particularly nothing negative about the layoff.

And at the hearing Siders testified, "They told me I was laid off and they had somebody else that had been with the company and they wanted to put them to work. They were nice about it. They didn't do me dirty. They were nice about it. I got along with them."

Siders contends "the fact that Mr. Siders was laid off so that a replacement worker could be employed implies that his work performance was substandard." It does not. Even if it did that implication would not be the most reasonable one. The more reasonable inference would be that the employer had an employee who had been with the employer previously, the employer wanted to put that employee back to work, and Siders happened to have the job the employer wanted the employee to have. Siders' hearing testimony supports this inference, not the one Siders advances in his brief.

There is no evidence that Siders was terminated in 2010 because of his mental illness or vision problems, or because his work was "substandard." The ALJ correctly found Siders' work to be inconsistent with the claim of disability.

III. CONCLUSION

The Commissioner's decision is affirmed.

IT IS SO ORDERED.

/s/ Ortrie D. Smith<br>
ORTRIE D. SMITH, SENIOR JUDGE<br>
UNITED STATES DISTRICT COURT

DATE: May 29, 2012

8